IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, Respondent, v. ANTHONY QUINDELL COOK, Appellant. | No. 81397-8-I DIVISION ONE UNPUBLISHED OPINION |

SMITH, J. — Following an incident with Anthony Cook's former girlfriend, Ariel Jenkins, a jury convicted Cook of (1) violation of a domestic violence protection order, (2) two counts of bail jumping, and (3) felony harassment. Cook appeals, assigning error to certain evidentiary rulings. Specifically, Cook contends that the trial court abused its discretion when it admitted (1) prior instances of alleged threats against Jenkins, (2) an information charging Cook, as a juvenile, with harassment and violation of a no-contact order, and (3) text messages that Cook allegedly sent to Jenkins.

We conclude that the State proffered sufficient proof for the court to find that the two prior incidents likely occurred and that their probative value, proving the reasonableness of Jenkins's fear and Cook's identity, was not substantially outweighed by the risk of prejudice. Moreover, the exhibit containing Cook's juvenile charge for protection order violation was relevant and not overly prejudicial. Finally, the State presented sufficient evidence to authenticate the text message evidence. Thus, we conclude that the trial court did not abuse its

Citations and pin cites are based on the Westlaw online version of the cited material.

discretion in admitting any of the challenged evidence, and we affirm.

FACTS

Cook and Jenkins were previously in a dating relationship. The relationship resulted in a son, B.B., who was born in 2014 after the relationship had ended. Jenkins received sole custody of B.B. Jenkins later testified at trial that she and Cook had difficulty coparenting and that shortly after B.B.'s birth, Cook would threaten her, telling her that she would never see her children again or that he was following her.

In 2017, Child Protective Services (CPS) began an investigation into Jenkins's husband and the safety of B.B. Accordingly, on May 31, 2017, CPS placed B.B. in Cook's custody. Jenkins later testified that during this time, Cook prevented Jenkins from contacting B.B. She stated that Cook continuously threatened her. One particular threat occurred on June 9, 2017, when Cook threatened to harm Jenkins if she filed anything with the court or notified the police of Cook's threats. Another incident occurred on June 18, 2017, when Cook threatened to take B.B. out of the state.

Around three weeks after Cook obtained custody of B.B., CPS ended its investigation into Jenkins's husband. CPS then placed B.B. back in Jenkins's custody. Jenkins later testified that, thereafter, Cook again threatened to take B.B. with him out of the state, told her that she "would never see [B.B.] again," and said that he would kill her. Jenkins also testified that at some point, her mother received a message from Cook that he knew Jenkins's husband was driving Jenkins's truck, had taken pictures of the truck, and had been following

2

the vehicle and Jenkins's husband.

On June 21, 2017, Jenkins petitioned for a domestic violence protection order against Cook,[1] asserting that Cook had threatened her with violence. The trial court granted the petition and ordered a temporary protection order (TPO).

On July 5, 2017, time constraints prevented the hearing on the protection order. Therefore, the court reissued the TPO and rescheduled the hearing for July 19.

But on July 17, 2017, Jenkins received threatening text messages from two unknown phone numbers. Jenkins believed the messages were from Cook because of the messages' content and the style of the writing therein. One text message read: "1st U take MY son from me even after I warned u of the repercussions. Then you try to get a No Contact Order against me from him too! Now I'm childish? . . . u fucc'd up." In another message, Jenkins called the sender Anthony, and the sender never corrected her. The messages also indicated that the sender had been conducting surveillance on Jenkins and her "trucc" and told Jenkins that "[t]he cops can't do [anything] for u but take a report when they find u dead after I'm done with u."

Jenkins called 911 to report the threatening messages. When police officers, including Officer Jocelyn Uria, responded to the call, Jenkins was upset. Officer Uria later testified that Jenkins's "hands were shaking so bad" that Jenkins could not hold her phone still. Officer Uria therefore had to hold

---

[1] Specifically, Jenkins sought an order for protection pursuant to RCW 26.50.030, which provides that "[t]here shall exist an action known as a petition for an order for protection in cases of domestic violence."

Jenkins's phone to take pictures of the text messages. As a part of the investigation, Jenkins provided a signed statement, declared under penalty of perjury, which described the incidents leading up to the text messages. The police thereafter arrested Cook for violation of the TPO.

The State later charged Cook with (1) count 1: one count of felony harassment or, in the alternative, one count of felony cyberstalking and (2) count 2: violation of a temporary protection order.

Prior to trial, the State moved to admit testimony describing Cook's past threats and conduct towards Jenkins. Cook objected under ER 404(b) and ER 403. And the court set an ER 404(b) hearing for March 12, 2018, for which Cook failed to appear. On June 13, 2018, Cook also failed to appear at a status hearing. The State therefore amended the information to include two counts of bail jumping.

On August 8, 2018, at the ER 404(b) hearing on the State's motion, the State argued that the evidence was admissible to show that Cook placed Jenkins in reasonable fear that Cook would carry out his threats and to show identity. For various reasons, Jenkins failed to appear at the ER 404(b) hearing. In the absence of her testimony, the court directed the State to present its offer of proof. To that end, the State offered four exhibits including a Thurston County Sheriff's Office report from 2013 regarding an incident between Jenkins and Cook, the complaint and the judgment and sentence therefrom, a copy of Jenkins's petition for the TPO in July 2017, and Jenkins's signed statement to the police that she provided after she received the threatening text messages.

The court accepted the State's offer of proof with regard to two incidents. Specifically, the court admitted evidence that (1) Cook previously used B.B. to control Jenkins and made threats to harm Jenkins and to take B.B. to another state and (2) Jenkins sought a protection order against Cook due to his threats of surveillance, of harm towards Jenkins, and of taking B.B. to another state. The latter incident was evidenced in Jenkins's petition for a protection order and in her written statement to the police. The court determined that those incidents occurred and were relevant to prove the "reasonable fear" element of harassment, as well as Cook's identity.

Trial began on January 8, 2019. During trial, outside the presence of the jury, Cook objected to the admission of the text messages that Jenkins received. The State offered Jenkins's testimony to authenticate the text messages. She testified that an unknown number sent the messages but that she suspected the messages were from Cook because they discussed only B.B., they mentioned a protection order, and they contained the use of "cc" in the place of "ck" for certain words, which she alleged is characteristic of Cook's text messages. The court overruled the objection and admitted the evidence, finding that the messages were properly authenticated. Cook testified and denied that he sent the messages.

The State also offered testimony from Officer Uria regarding Cook's 2004 juvenile conviction for telephone harassment. To this end, the State offered three exhibits pertaining to the prior conviction: exhibit 13 (the certified protection order imposed against Cook for the victim, J.K.), exhibit 14 (the certified

information for the conviction in exhibit 15, containing two charges, one for violating the protection order from exhibit 13 and a second for telephone harassment), and exhibit 15 (the certified judgment and sentence wherein Cook pled guilty to telephone harassment and which ordered that Cook have no contact with the J.K. family).  Cook objected to exhibit 14 based on relevancy and prejudice.  In the alternative, he argued that the court should redact the charge for violation of a protection order because he was never convicted thereof.  The court held that it could not redact the charge because the exhibit was a certified copy and admitted the information as relevant and not overly prejudicial.  However, the court provided a limiting instruction to the jury:

> Certain evidence has been admitted in this case for only a limited purpose.  Exhibit numbers 13, 14, and 15 were admitted into evidence by the court for the limited purpose of whether or not the state has proven that the defendant was previously convicted of the crime of harassment against a person who was specifically named in a no contact order or a harassment order.  You may not consider these exhibits for any other purpose.  Any discussion of this evidence during your deliberations must be consistent with this limitation.

Following trial, the jury found Cook guilty as charged.  Cook appeals.

ANALYSIS

Standard of Review

We review decisions to admit evidence for abuse of discretion.  In re Detention of H.N., 188 Wn. App. 744, 753, 355 P.3d 294 (2015).  "'Abuse of discretion' means 'no reasonable judge would have ruled as the trial court did.'"  State v. Arredondo, 188 Wn.2d 244, 256, 394 P.3d 348 (2017) (quoting State v. Mason, 160 Wn.2d 910, 934, 162 P.3d 396 (2007)).  "Put another way,

to reverse we must find the decision is 'unreasonable or is based on untenable reasons or grounds.'" Arredondo, 188 Wn.2d at 256 (internal quotation marks omitted) (quoting Mason, 160 Wn.2d at 922).

## Prior Bad Act Evidence

Cook contends that the trial court abused its discretion when it admitted evidence of Cook's prior bad acts. Specifically, Cook contests the admission of (1) two prior conflicts between Jenkins and himself and (2) State's exhibit 14, which charged Cook with a protection order violation. For the reasons discussed below, we conclude the trial court did not err with regard to either admission.

Under ER 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). But before admitting ER 404(b) evidence under one of these exceptions, the trial court must

> "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the [permissible] purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."

Arredondo, 188 Wn.2d at 257 (alteration in original) (internal quotation marks omitted) (quoting State v. Gresham, 173 Wn.2d 405, 421, 269 P.3d 207 (2012)).

State v. Ragin[2] is instructive. There, James Ragin's acquaintance, William Dahl, refused to post bail for Ragin, and Ragin responded by threatening to

---

[2] 94 Wn. App. 407, 972 P.2d 519 (1999).

murder Dahl and his family.  Ragin, 94 Wn. App. at 410.  The State later charged Ragin with felony harassment.  Ragin, 94 Wn. App. at 410.  Prior to trial, the State sought to admit evidence that "Ragin told Dahl that he could build bombs, had access to guns and ties to organized crime, and that he could level the City Church and 'waste' the pastors."  Ragin, 94 Wn. App. at 409-10.  Ragin also had told Dahl that he "suffered from episodic rages" and that the local police knew him well.  Ragin, 94 Wn. App. at 409.  Because the reasonableness of Dahl's fear was an element of the crime of felony harassment, the trial court admitted Dahl's testimony of each statement that Ragin made to him.  Ragin, 94 Wn. App. at 410.  However, the court provided a limiting instruction to the jury on the proper use of the evidence.  Ragin, 94 Wn. App. at 410.  On appeal, we held that the trial court did not abuse its discretion in admitting Dahl's extensive testimony even though "everything Ragin told Dahl . . . was not necessary to prove Dahl's state of mind."  Ragin, 94 Wn. App. at 412.

Here, the trial court admitted two incidents between Cook and Jenkins.  First, the court admitted Jenkins's allegations that in the summer of 2013, Cook was controlling and that after B.B. was born, he threatened to take B.B. to another state.  Second, the court admitted Jenkins's allegation that prior to Jenkins seeking a protection order, Cook threatened to kill her if she reported his threats and that Cook had asserted that he was maintaining surveillance on Jenkins's car.

The State offered the incidents to show the reasonableness of Jenkins's fear and to show Cook's identity.  As to Jenkins's fear, like the defendant in Ragin,

8

the State charged Cook with felony harassment. And RCW 9A.46.202(1)(b) requires the State to prove beyond a reasonable doubt that Cook, "by words or conduct," placed Jenkins "in *reasonable* fear that the threat will be carried out." (Emphasis added.) To this end, the prior incidents provided context for Cook's threat and Jenkins's fear thereof and provided the basis for the jury's determination that Jenkins's fear was reasonable. Thus, the evidence had a high probative value, i.e., evidence of an element of the charged crime. And, like Ragin, while it might be the case that not all of the evidence admitted was necessary to prove reasonableness, we cannot conclude that the trial court abused its discretion when it admitted both incidents in addition to other evidence presented by the State.

As to identity, Cook testified that he did not send the text messages. As a consequence, because the prior incidents involved similar threats including assertions of surveillance and contentions that Cook would take B.B. to another state, the incidents were relevant to identity. See, e.g., State v. Fualaau, 155 Wn. App. 347, 357, 228 P.3d 771 (2010) ("Even where the common features of the crimes are not individually unique, such that they 'amount to a signature,' the 'appearance of several features in the cases to be compared . . . can create sufficient inference that they are not coincidental,'" and justify "'the trial court's finding of relevancy.'" (quoting State v. Vy Thang, 145 Wn.2d 630, 644, 41 P.3d 1159 (2002))). Thus, the trial court did not err when it admitted evidence of the two incidents.

Cook disagrees and asserts that the trial court should have conducted a

hearing because it could not fairly decide whether the ER 404(b) evidence actually occurred. But the State offered as proof four exhibits. With regard to the 2013 incident, the State offered a police report and Cook's judgment and sentence for domestic violence. With regard to the most recent incident, the State offered Jenkins's statement to the police and her petition for a protection order. The offered exhibits sufficiently support the trial court's determination that more probably than not the incidents occurred. See State v. Asaeli, 150 Wn. App. 543, 576-77, 208 P.3d 1136 (2009) ("'Preponderance of the evidence means that considering all the evidence, the proposition asserted must be more probably true than not.'" (quoting State v. Ginn, 128 Wn. App. 872, 878, 117 P.3d 1155 (2005))). Thus, the trial court did not err in concluding that the State proved that the incidents occurred by a preponderance of the evidence. Furthermore, "the trial court is in the best position to determine whether it can fairly decide, based upon the offer of proof, that a prior bad act or acts probably occurred." State v. Kilgore, 147 Wn.2d 288, 295, 53 P.3d 974 (2002). Accordingly, we find no error in the trial court accepting the State's offer of proof without a hearing.

Cook also contends that the trial court erred in finding that the probative value of the incidents was not substantially outweighed by the risk of unfair prejudice. Specifically, Cook contends that the State relied on Officer Uria's testimony that Jenkins was shaking and on Jenkins's testimony that she was afraid. He contends that the additional evidence of Jenkins's fear therefore had little probative value. However, as the State points out, it had to prove each element, including the reasonableness of Jenkins's fear, beyond a reasonable

doubt. Thus, the trial court did not abuse its discretion in concluding that the probative value was not substantially outweighed by the risk of prejudice.

The trial court also admitted exhibit 14, which is best understood in the context of exhibit 13 and exhibit 15. Exhibit 13 was a temporary domestic violence protection order granted in 2004 against Cook, protecting J.K. Exhibit 14 was an information from 2004 showing that the State charged Cook with telephone harassment and violation of J.K.'s protection order. And exhibit 15 was the judgment and sentence from the same incident wherein Cook pled guilty to telephone harassment and was ordered not to contact J.K.'s family.

Here, in order to have convicted Cook of felony harassment, the State had to prove beyond a reasonable doubt that Cook "ha[d] previously been convicted . . . of any crime of harassment . . . of . . . any person specifically named in a no-contact or no-harassment order." RCW 9A.46.020(2)(b). Accordingly, like in Ragin, exhibit 14 was relevant to a required element of the charged crime. Specifically exhibit 14 provided evidence that Cook was convicted of harassing J.K. in particular. This probative value was not substantially outweighed by the risk of prejudice. Furthermore, we presume the jury did not consider exhibit 14 as propensity evidence. See Carnation Co. v. Hill, 115 Wn.2d 184, 187, 796 P.2d 416 (1990) ("A jury is presumed to follow the court's instructions and that presumption will prevail until it is overcome by a showing otherwise."). We therefore conclude that the trial court did not abuse its discretion when it admitted exhibit 14.

Cook admits that the telephone harassment charge was relevant to the

State's case for felony harassment but asserts that the certified information was irrelevant because the State admitted the judgment and sentence. However, the State had to prove that Cook harassed someone subject to a protection order. Because the judgment and sentence referenced only J.K.'s family and the protection order applied only to J.K., exhibit 14 provided the necessary connection between the two court documents. Therefore, we do not agree that it was irrelevant.

Cook also contends that the court should have redacted the charge for violation of a protection order. The court held that because exhibit 14 was a certified document, it was improper and unlawful to alter the document. In this conclusion, the court was incorrect. See, e.g., State v. Melland, 9 Wn. App. 2d 786, 795-96, 452 P.3d 562 (2019) (noting no error in the court's admission of a redacted certified copy of a domestic violence no-contact order). However, the trial court correctly concluded that the probative value of the information, including the unredacted charge for the protection order violation, was not substantially outweighed by the prejudicial effect, and the trial court provided a limiting instruction. Thus, its error in this regard is immaterial.

<u>Text Message Evidence</u>

Finally, Cook contends that the State did not properly authenticate the text message evidence presented at trial and that the court therefore erred in admitting it. We disagree.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding

that the matter in question is what its proponent claims." ER 901(a). "Because the proponent must make only a prima facie showing of authenticity for purposes of establishing admissibility, ER 901 is met 'if the proponent shows enough proof for a reasonable fact finder to find in favor of authenticity.'" H.N., 188 Wn. App. at 751 (quoting State v. Payne, 117 Wn. App. 99, 108, 69 P.3d 889 (2003)). In determining the authenticity of evidence, "[a] trial court may, therefore, rely upon such information as law opinions, hearsay, or the proffered evidence itself," State v. Williams, 136 Wn. App. 486, 500, 150 P.3d 111 (2007), and the evidence must be "'reliable, but need not be admissible.'" H.N., 188 Wn. App. at 751 (quoting Williams, 136 Wn. App. at 500).

Here, Jenkins testified that she did not recognize the phone numbers that sent the text messages, that she had changed her number between six and eight months prior to receiving the messages, and that she had not personally informed Cook of her new phone number. But Jenkins also testified in support of a finding for authenticity. Specifically, while Jenkins did not provide Cook with her new phone number, she contended that she provided her number on an assignment sheet during a CPS meeting and that at the meeting, everyone received a copy of the sheet. She also testified that Cook often used different numbers when he contacted her and that he obtained the new numbers from an application on his phone. More importantly, the content of the messages made Jenkins believe that they came from Cook. In particular, the messages pertained to B.B. only and mentioned a protection order. As to the protection order, Jenkins's only other protection order at the time was against her husband, who

13

was incarcerated when she received the messages. Jenkins also testified that Cook frequently replaces the letters "ck" with "cc" in text messages and the text message evidence included similar changes. Based on all of Jenkins's testimony, a reasonable fact finder could find in favor of the text messages' authenticity. Therefore, the trial court did not abuse its discretion.

Cook disagrees and attempts to distinguish State v. Young, 192 Wn. App. 850, 369 P.3d 2005 (2016). There, the court concluded that the text messages were properly authenticated where the recipient of the text messages had personal knowledge that the sender was Eugene Young and where the content of the messages also supported that determination. Young, 192 Wn. App. at 856-57. Cook contends that unlike the recipient in Young, Jenkins had no personal knowledge of who the sender was. In attempting to distinguish Young on this basis, Cook urges us to adopt a rigid test for authentication. But "'[t]he proponent of the offered evidence need not rule out all possibilities inconsistent with authenticity or conclusively prove that the evidence is what it purports to be.'" H.N., 188 Wn. App. at 751 (capitalization and internal quotation marks omitted) (quoting State v. Andrews, 172 Wn. App. 703, 708, 293 P.3d 1023 (2013)). Instead, the State only had to show that a reasonable fact finder could find in favor of authenticity. As discussed above, it did.

Because the trial court did not err in its evidentiary ruling, we need not address Cook's harmless error analysis.  Therefore, we affirm.

_____

WE CONCUR:

_____        _____